Ralph W. Gwinn v. Commissioner.
Gwinn v. Commissioner
Docket No. 108144.
United States Tax Court
1944 Tax Ct. Memo LEXIS 206; 3 T.C.M. (CCH) 548; T.C.M. (RIA) 44208; June 9, 1944
*206 Joyce Stanley, Esq., and H. J. Rudick, Esq., for the petitioner. C. C. Holmes, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner contests a portion of a deficiency determined in his income tax for the year ended December 31, 1934, in the amount of $63,583.09. The sole question presented is whether petitioner realized taxable income in 1934 under section 22 (a) of the Revenue Act of 1934, by reason of a transaction by which his indebtedness to a certain corporation was reduced. Findings of Fact The parties have stipulated certain of the facts which we hereby find accordingly. Facts otherwise found from the record and a summary of the stipulated facts are as follows: Petitioner, Ralph W. Gwinn, is an individual with residence in Bronxville, New York. His income tax return for the year in question was filed with the collector for the third district of New York. Petitioner is an attorney and member of the firm of Gwinn & Pell. For many years prior to 1934 he had had business relations with J. C. Penney, chairman of the Board of the J. C. Penney Company. In 1924 Penney suggested to petitioner that they form a corporation *207 to carry on various business activities which they had previously carried on individually and to enter into new business ventures. Subsequent conversations led to the creation of the J. C. Penney-Gwinn Corporation (hereinafter referred to as Corporation) in November, 1925. On December 8, 1925, petitioner, Penney, and Corporation entered into a written agreement. This agreement, after reciting the business purpose of Corporation, listed assets which were to be contributed to it by petitioner and Penney in exchange for Corporation stock. The agreement provided that one Rood was to appraise the value of the contributed assets as of December 31, 1925, and not less than two-thirds of the stock of Corporation was to be issued to petitioner and Penney in proportion to the value of assets contributed by each of them. It was provided that after the listed assets had been appraised, petitioner was to contribute a promissory note or cash in an amount which would make his total contribution equal one-tenth of the total contributed by both parties. A valuation as of December 31, 1925, submitted by Rood on February 3, 1926, showed assets valued at $11,044,753.91 contributed by Penney, and assets *208 valued at $1,227,194.88 contributed by petitioner. Petitioner's contribution included a promissory note made by him, dated January 6, 1926, and payable one day after. It was in the face amount of $249,077.10 and carried interest at 6 percent. The purpose of giving the note was to bring petitioner's interest in Corporation up to one-tenth. Other than this note the assets contributed by petitioner constituted only about 8 percent of the total contributed. On February 24, 1926, the Board of Directors of Corporation voted to accept petitioner's promissory note and to issue stock having a par value equal to the appraised value of the assets contributed by Penney and petitioner. In pursuance of the agreed plan 19,030 shares, each with a par value of $100, were issued, 17,127 shares to Penney, and 1,903 to petitioner. Petitioner had contributed substantially all his personal assets for the stock. By giving his note for $249,077.10 he acquired 386 more shares than he otherwise would have received. It had been Penney's business practice for a long time to take other men into business with him and to arrange for them to pay for their interest in the business out of its earnings. It was in *209 line with this policy that Penney suggested the above agreement with petitioner. Penney proposed that petitioner have at least 10 percent interest in the business to compensate him for giving up, to a large extent, his law practice and for devoting most of his time to the activities of the Corporation. At the time petitioner gave this note to Corporation it was understood between him and Penney that the note would be paid out of earnings of Corporation and that to protect petitioner, Corporation would take out life insurance in the amount of $250,000 on petitioner's life. It was also agreed between petitioner and Penney, acting for Corporation, that the note was to be paid only out of Corporation earnings or capital or out of proceeds of insurance policies described below. In December, 1927, Corporation procured life insurance policies in the amount of $250,000 on petitioner's life, the premiums being paid by Corporation. Petitioner included the premiums as compensation for services in his income tax returns. Policies of a total of $250,000 were kept in force from January, 1928, to January, 1932; the amount of $150,000 was kept in force throughout 1932; and $50,000 in 1933. After *210 1933 no policies were carried because of Corporation's financial difficulties. The beneficiaries of the policies were variously petitioner's wife and petitioner's estate. During the period 1925-1934 Corporation paid only one dividend, and that in a very small amount. While its earnings were large in the first few years, they were all put into new and expanding ventures. In addition, Corporation borrowed approximately $7,000,000 from various banks and this too was invested in new ventures. From 1930 to 1934 Corporation suffered large losses and was in serious financial difficulties. As of January 1, 1930, substantially all its marketable assets consisted of 353,350 shares of J. C. Penney Company common stock having a book value of $25,185,358, against which it owed $6,205,000. By December, 1933, as a result of sales by banks with which the stock had been pledged Corporation owned 59,920 shares of J. C. Penney Company common with a book value of $2,796,000 against which it owed $825,404.60. During the period after the stock market crash in 1929 through 1932 petitioner attempted to support the value of J. C. Penney Company common stock by purchasing it at the market price. To purchase *211 stock during this period of declining value petitioner borrowed money from banks and pledged J. C. Penney Company stock he had previously owned outright. In addition, he pledged the stock he purchased with the loans but as the market continued to fall the lenders demanded more collateral. To meet these demands petitioner from time to time borrowed J. C. Penney Company stock from Corporation. In all he borrowed 7,300 shares from Corporation for this purpose. By 1932 all the stock so pledged by petitioner was sold by the bankpledgees. The 7,300 shares borrowed from Corporation were sold by the banks for $115,579.40. On the books of Corporation petitioner was charged with a loan of 7,300 shares at $25 a share, a total of $182,500. Between 1926 and 1934 petitioner's original 1,903 shares of stock in Corporation were reduced to 1,453 shares. A part of this reduction was brought about by a return by petitioner on or about June 6, 1930, of 100 shares to Corporation at an agreed valuation of $1,050 per share, the proceeds to the extent of $39,077.10 being applied against the principal of petitioner's promissory note of $249,077.10 and the remainder of the proceeds, $65,922.90, being applied *212 to interest on that note. Petitioner had pledged 350 shares to J. C. Penney as security for a personal loan of $50,000, and these shares on December 31, 1932, were transferred in discharge of the debt. Just prior to January 27, 1934, petitioner owned 1,453 shares of stock in Corporation and Penney owned 17,477 shares. On June 6, 1930, when petitioner returned 100 shares of stock in Corporation in reduction of his original note of January 6, 1926, he substituted for the old note a new note for $210,000 maturing three years from date. To conform with financial statements issued by Corporation to banks which had extended credit to it the note did not contain any provisions limiting the source out of which petitioner was obligated to pay it. However, the understanding as between Penney, acting for Corporation, and petitioner as to the nature of petitioner's liability was unchanged. In a letter to Corporation dated June 20, 1931, petitioner stated that in the event of his death before maturity of the $210,000 note the balance due would be paid by his executor out of the insurance proceeds. On January 27, 1934, petitioner was indebted to Corporation for three items. First, he owed Corporation *213 for the 7,300 shares of J. C. Penney Company stock he had borrowed. Petitioner felt that his liability was limited under New York law to $115,579.40, an amount for which Corporation could have repurchased the converted stock had it attempted to do so within a reasonable time after the sale by the pledgee, although it was carried on Corporation's books at $182,500, the value of the stock at the time it was borrowed. The second item of indebtedness was an open account liability for money advanced in the amount of $15,186.44. The third item was the note of June 6, 1931, in the face amount of $210,000, the liability on which amounted to $226,450, including interest. The total indebtedness was $357,215.84. On the books of Corporation an entry was made on December 31, 1932, setting up a reserve of $100,000 against petitioner's note. As of December 31, 1933, an additional amount of $324,138.68 was credited to this reserve so that there was a full reserve not only against the note but also against petitioner's liability on the stock and open account. These reserves were set up in accordance with Corporation's practice of carrying reserves against doubtful assets. On January 27, 1934, petitioner, *214 Penney, and Corporation entered into an agreement which by its terms provided: "J. C. Penney, Esq., and J. C. Penney-Gwinn Corporation 330 West 34th Street, New York City "My dear Sirs: "Confirming arrangements which have been under consideration for some time between us, and pending the more formal legal agreement to be signed by us, I am attempting to set down in this letter the principal items to which we have agreed: "FIRST: The J. C. Penney-Gwinn Corporation will deliver to me One Hundred (100) shares of its capital stock, which together with Fourteen Hundred Fifty Three (1453) shares now in my name makes a total of Fifteen Hundred Fifty Three (1553) shares to be owned by me, or approximately 8 1/2 % of the total stock. "SECOND: My indebtedness to the corporation is fixed at Two Hundred Fifty Thousand Dollars ($250,000.00) covering all claims of whatsoever character, including the loan of Seventy Three Hundred (7300) shares of J. C. Penney Company common stock to me. "THIRD: The corporation will buy "Broad Meadows" Farm on Route 22, Pawling, New York, for the sum of Sixty Thousand Dollars ($60,000.00) and apply this purchase to the reduction of the above-mentioned indebtedness *215 of Two Hundred Fifty Thousand Dollars ($250,000.00), leaving a balance due by me to the corporation of One Hundred Ninety Thousand Dollars ($190,000.00). * * * * *
"FOURTH: It is agreed that I shall deliver my note for One Hundred Ninety Thousand Dollars ($190,000.00) payable to the corporation, without interest, and to become due at my death. "A proportion of dividends payable on my stock, hereinafter referred to, when declared, shall be applied toward the payment of said One Hundred Ninety Thousand Dollars ($190,000.00) note. "For security of the payment of this note all of my stock in J. C. Penney-Gwinn Corporation is to be attached as collateral security for the same, and such security for the payment of said note is to be held by the corporation until my death, unless the note is paid by me in the meantime through application of dividends, or otherwise. "Upon my death the fair value of my shares of stock shall be ascertained as of the date of my death. In arriving at the value of my shares in the corporation, the market value of all stocks and bonds owned by the corporation, and the fair value of all other property shall be taken. "If there is any disagreement as to the *216 value of all of the net assets owned by the corporation, from which the value of my shares of stock shall be taken, then such fair value shall be ascertained by three arbitrators, - one to be appointed by the corporation, one by my legal representatives and the third by the two so appointed. "When the value of my shares shall have been ascertained, a number of shares having a value equal to the amount of the balance due on the said One Hundred Ninety Thousand Dollar ($190,000.00) note, at the time of my death, shall be retained by the corporation and cancelled. The note, whenever paid, shall be marked "cancelled and paid" and surrendered to my legal representatives, together with any excess stock held by the treasurer of the corporation and unnecessary for the liquidation of said note. "The note shall not be a claim against the general assets of my estate, but shall be paid only out of the dividends, as hereinafter provided, or out of the cancellation of my shares of stock, as above provided. "FIFTH: It is the desire of the parties hereto to apply a part of the dividends which may be paid on the stock owned by me to a reduction of my indebtedness to the corporation. "It is, therefore, *217 agreed that all dividends paid by the corporation up to an amount equal to 50% of the annual accumulative net earnings, beginning January 1st, 1934, (excluding any gains on sale of J. C. Penney Company common stock on hand January 1st, 1934, and any stock dividends on such stock of the corporation applicable to my shares, shall be paid to me. All dividends above that amount paid by the corporation on my stock shall be retained by the corporation and applied to the payment of said note, which note on its face shall refer to this agreement. Any distribution of capital assets on my shares shall all be applied on account of the payment of my note. "Very truly yours, (Signed) Ralph W. Gwinn "Accepted and approved this 27th day of January, 1934 J. C. PENNEY-GWINN CORPORATION By (Sgd) J. C. Penney." At the end of the original agreement signed by Penney for Corporation there was a notation in the handwriting of Penney to the effect that the agreement was subject to the provision that the firm of Gwinn & Pell waived all claims for past services rendered and that all agreements as to payment for future services were to be in writing before the services were performed. At the time Gwinn *218 & Pell had no claim against Penney or Corporation for past services. On the books of Corporation the above agreement was reflected by the following entry: "To set up accounts in accordance with agreement of January 27th, 1934, between R. W. Gwinn, J. C. Penney and J. C. Penney-Gwinn Corporation. "Penney-Gwinn to issue him 100 shares of stock, cancel open account of $197,688.68 and notes for $226,450.00 and take in return deed to Broad Meadows and his note for $190,000.00 without interest, and payable according to agreement. "Charge: Notes Receivable
$190,000.00
Broad Meadows
60,000.00
Surplus
184,138.68
$434,138.68
"Credit: Capital stock
10,000.00
Notes Receivable
226,450.00
Ralph W. Gwinn
197,668.68
$434,138.68" The $197,688.68 open account in the name of petitioner referred to above consisted of $182,500 representing a charge to him of $25 per share for the 7,300 shares of Penney Company stock advanced and $15,188.68 representing miscellaneous amounts advanced to him. Corporation claimed no deduction in its Federal income tax return for the year 1934 for any loss resulting from the adjustment of this indebtedness. The cost basis of "Broad Meadows Farm" transferred *219 by the above agreement at an agreed value of $60,000 was $48,106.50. It had been acquired by petitioner on September 16, 1929. The stock of Corporation on January 27, 1934, had a value of $266.51 per share. Its value on the books of Corporation was $245 a share. petitioner was solvent both before and after the 1934 agreement. In the notice of deflciency, respondent determined that petitioner had "realized taxable income of $141,257.36 which was not reported in your 1934 return from a transaction entered into with the J. C. Penney-Gwinn Corporation during that year. By means of this transaction you effected a cancellation of a part of your indebtedness to the corporation and realized taxable income therefrom * * *." Opinion The present claim that petitioner received taxable income by the reduction of his indebtedness involves an obligation originally undertaken by him as the consideration for the purchase of property. The authorities most nearly apposite are consequently such cases as , and , rather than , *220 on the one hand, or , on the other. In order to apply the "readjustment or purchase price" theory of Hirsch v. Commissioner and its companion cases, it becomes necessary to compare the value of the purchased property when the reduction in indebtedness occurred with the figure to which the debt was then reduced. If the amount remaining due after adjustment continues to be as much as the diminished value of the property, the necessary elements for application of the Hirsch principle, accompanied by a corresponding reduction in the debtor's basis for the property, appear to be furnished. In analyzing the facts the practical effect of what was done rather than any slight variations in the method of its accomplishment is the significant consideration. , affirmed (C.C.A. 6th Cir.), . What apparently happened here was that petitioner originally bought 386 shares of stock at a price of $249,077.10 for which he gave his promissory note in that amount. The transaction was not phrased in those *221 precise terms, but it is clear that having paid for a larger amount of stock by the transfer of assets, petitioner received the additional number of shares only by reason of the delivery of his note, and it is sufficient for our purposes if we emphasize that the original debt was created in order to secure to petitioner that number of additional shares which he would not otherwise have received. The next step was in effect a partial revision of that original transaction. It consisted of a subsequent return by petitioner of 100 of the shares. and the consequent reduction of his note from $249,077.10 to $210,000. Although again the transaction was not couched in that language, the effect was that petitioner was left with 286 shares for which he continued to owe $210,000. We think it clear that the parties were not there dealing, except as a matter of additional collateral, with the remaining shares which petitioner had acquired, for there was no attempt made at that time to readjust the consideration which he had paid for them in the form of property. The alteration was on the one hand a reduction of his note and on the other a corresponding return of the purchased shares. Coming *222 to thesettlement which took place in the year before us and which gives rise to the present controversy, we find that the parties so dealt with their respective interests that the ultimate effect was to readjust petitioner's obligation at $2v000, by the transfer of property worth $60,000 and the reduction of his indebtedness to $190,000, in exchange for four benefits received by him: First, the discharge of an indebtedness of $115,579.40; second, the liquidation of an open account in the amount of $15,186.44; third, the receipt of 100 additional shares of stock which the parties now agree had a fair market value at that time of $26,651.52; and finally, cancellation of his purchase money note of $210,000. Elimination of a further item of interest is conceded by respondent not to be involved since petitioner had never been permitted to deduct it from gross income. Taking the first three items at their face amount, the total comes to $157,417.36, leaving for application against the purchase money note of $210,000 the balance of the $250,000, or $92,582.64, for which petitioner even after the reduction continued to be liable. The parties did not speak in terms of a readjustment of price, *223 and this allocation of the payment does not accord with petitioner's testimony as to the method by which the amount was computed, but here again it is the ultimate effect rather than the details of the treatment which calls for consideration. Applying then the principle of the Hirsch case, a comparison of the stipulated fair market value of the 286 shares for which the debt, as previously adjusted, was contracted, with the remaining indebtedness after the final readjustment, shows that the stipulated value of 286 shares was 286 multiplied by $266.51, or $76,221.86, while the amount petitioner continued to owe therefor was the appreciably larger amount of $92,582.64. The property purchased being thus demonstrated to have diminished in value below the adjusted indebtedness remaining due, we think it follows that the necessary conditions for the application of the Hirsch principle and the corresponding reduction of basis sufficiently appear, and that accordingly no income was realized by petitioner as a result of the transaction with his creditor-vendor under the circumstances shown by the present record. The *224 property transferred by petitioner and accepted by the creditor at its fair market value of $60,000 had an agreed cost basis to petitioner of only $48,106.50. Petitioner now concedes that the difference of $11,893.50 is taxable to him as an intermediate term capital gain, and that there is a corresponding deficiency now due, Except to that extent we think respondent's determination was in error. Decision will be entered under Rule 50.